# IN THE MATTER OF JAMES LOGAN, JR.,
## AN ATTORNEY AT LAW.

Argued December 2, 1975—Decided May 13, 1976.

*Mr. John Lee Madden* argued the cause for the Burlington County Ethics Committee.

*Mr. Martin L. Haines* argued the cause for respondent.

PER CURIAM. James Logan, Jr., a member of the bar in this state, has been charged with violations of certain ethical standards in two separate proceedings, hereinafter referred to as the Liddell and Parmigiani matters. After hearings had been held on both matters, the Burlington County Ethics Committee submitted two presentments to this Court, in response to which we issued an order to show cause why the respondent should not be disbarred or otherwise disciplined with respect to each presentment. During the course of the proceedings, respondent moved to dismiss both charges on the basis of a general broadbased attack against disciplinary proceedings. We address ourselves initially to the motions.

## I. THE MOTIONS TO DISMISS THE DISCIPLINARY PROCEEDINGS

The respondent charges that the disciplinary rules do not provide for a "fair or meaningful hearing as required by the rules of due process." It is contended that constitutional due process rights are violated because: (1) the Ethics Committee acts as "investigator, prosecutor, judge and jury"; (2) the respondent is denied the right to examine the investigative report and there are no available discovery rules; and (3) there are no appeals from determinations on motions or decisions of this Court.

Article 6, § 2, paragraph 3 of the Constitution confers "jurisdiction over the admission to the practice of law" and imposes the duty of disciplining persons so admitted on the Supreme Court. The Court's responsibility is to protect the public, purify the bar, and prevent recurrent deviations from the ethical standards which members of the bar must meet. *In re Malanga,* 45 *N. J.* 580, 584 (1965). In discharging this duty, the Court must exercise its powers with just and decent regard for all vital interests concerned, including those of the public, the bench, the bar and the individual respondents. *In re Greenberg,* 21 *N. J.* 213, 224–225 (1956).

The American Bar Association's ethical code has been substantially adopted by this Court as its Disciplinary Rules. Preliminary investigation, preparation of charges, and presentment of the matters to this Court have been entrusted primarily to ethics committees in each county. The respondent misconstrues the function of these committees and the manner in which they operate. These committees are agents of the Supreme Court. It is the Supreme Court which in the final analysis makes the factual findings, draws the legal conclusions, and determines the appropriate discipline. Chief Justice Vanderbilt in *Toft v. Ketchum,* 18 *N. J.* 280 (1955), delineated the procedure:

* * * Moreover, the filing of a complaint with one of our ethics and grievance committees is in effect a filing with the Supreme Court, in

which alone the power to discipline attorneys at law in New Jersey resides, *Const.*, *Art.* VI, *Sec.* II, *par.* 3. The several county ethics and grievance committees established under our rules of court, *R. R.* 1:16-1 *et seq.*, are arms of the court which perform the very important functions of receiving complaints, investigating them, holding hearings on them, and then presenting their findings to the court. The Supreme Court, however, has at all times full control over the proceedings and regardless of the conclusion of the committee a full report must be submitted to the court, *R. R.* 1:16-4 (h), which, although giving due weight to the findings and conclusions of the committee, has the sole responsibility of deciding whether the attorney in question should be disciplined. From the very beginning a disciplinary proceeding is judicial in nature, initiated by filing a complaint with an ethics and grievance committee. [*Id.* at 284].

Proceedings may be instituted before the county ethics committee in one of three ways: filing of a complaint by some third person, on a committee's own motion, or at the direction of the Supreme Court. The matter is usually assigned to a committee member who investigates and submits a written report to the committee. Upon the filing of a complaint, service is made on the attorney who must file his answer within 10 days. *R.* 1:20-4(c). If there is "an indication of unethical or unprofessional conduct," the matter is set down for a hearing. *R.* 1:20-4(d). The respondent is notified of the time and place of the formal hearing, that he may be represented by counsel, that subpoenas will be furnished upon his request and that witnesses and other proof may be submitted at the hearing. *R.* 1:20-4(d).

The hearing is conducted in private. The attorney has a right to be present and to examine and cross-examine witnesses. *R.* 1:20-4(f). Strict rules of evidence do not apply. *Id.*

At the conclusion of the hearing, the committee submits its written findings and conclusions. If no unethical or unprofessional conduct is found, the complaint is dismissed and the report filed with the Administrative Director of the Courts. On the other hand, if its findings are adverse to the attorney, a presentment is prepared and submitted with

the transcript of the hearing and all the exhibits to the Supreme Court. *R.* 1:20-4(h). The Supreme Court reviews the file and decides whether further proceedings are warranted. If so, it issues an order to show cause directed to the respondent. *R.* 1:20-4(i). Briefs are filed and oral argument held. *Id.* The Supreme Court then makes its findings of fact and conclusions of law.

■■ The respondent contends that the disciplinary process is equivalent to a criminal proceeding. But it is not. It is *sui generis.* In *In re Ries,* 131 *N. J. L.* 559 (Sup. Ct. 1944) the court described the function of the proceeding:

But the proceeding is not criminal in nature. It is an exercise of the summary disciplinary jurisdiction of this court over attorneys and counselors, as officers of the court. *Strong & Sons v. Mundy,* 52 *N. J. Eq.* 833. It is civil in character, or, perhaps, it is more accurate to say it is *sui generis,* for it partakes, essentially, of an inquiry to determine whether the delinquent practitioner is unworthy of the trust and confidence which attend the relationship of attorney and client. This is necessarily the basic consideration. The object of disciplinary proceedings is not alone to punish the attorney guilty of malpractice; the primary purposes are to compel the attorney to deal fairly and honestly with his client, and to determine whether he has, by his conduct, proved himself unfit to be entrusted with the duties and responsibilities of the office of attorney. *In re Lentz,* 65 *N. J. L.* 134. If it is thereby evident that there is such deficiency of character as disqualifies him for the confiidence and trust inherent in the office, the public interest requires that he be ousted; and this wholly apart from any consideration of punishment. [*Id.* at 562].

The purpose of a disciplinary sanction, whether it be a reprimand, suspension, or a disbarment, is not punishment, but maintenance of the integrity and purity of the bar, elimination of unfit persons from the practice of law, and vindication of public confidence in the bar and the administration of justice.

■ In conjunction with his misunderstanding of the essential nature of a disciplinary proceeding, the respondent erroneously equates a hearing by an ethics committee with a

jury trial. Throughout the process committee members have different functions than the jury. The investigating committee member does not sit as the fact finder. He investigates and presents the matter to other committee members who submit recommended factual findings to the Court.[1] Further it must be remembered that all committee members, unlike jurors, are members of the bar — trained in the rules of evidence and skilled in distinguishing competent from incompetent evidence and able to impartially judge facts presented at the hearing. The respondent's charges that the Burlington County Ethics Committee which heard the matter had not discharged its functions with integrity, was biased, was not fair and impartial and did not base its adjudication on competent evidence in the record are unfounded, unjustified and unsupportable.

The disciplinary proceedings afford the attorney a full opportunity to be heard, and to confront and cross-examine witnesses. He may present whatever relevant evidence he desires and has the right to subpoena witnesses and documents. He may submit briefs and orally argue the cause before the Supreme Court — the only body which has the authority to decide the issues, factual and legal, and fix the disciplinary terms. Nor contrary to respondent's assertion is there a denial of due process because no appeal is possible from this Court's decision. It has frequently been held that the right of appeal is not essential to due process. *Ohio ex rel. Bryant v. Akron Metrop. Pk. Dist.*, 281 *U. S.* 74, 50 *S. Ct.* 228, 74 *L. Ed.* 710 (1930); *Griffin v. Illinois*, 351

---

[1]At the hearing respondent was advised that "as far as any investigation that may have happened before, that's really not a part of the case. That is only to assist the member of the committee who is going to present the matter in an orderly way, and that prior involvement by Mr. Smith [the investigator and presenter] will become clear as the proceedings progress * * * nor will there be any material considered that you will not have had a chance to review * * *."

U. S. 12, 76 *S. Ct.* 585, 100 *L. Ed.* 891, reh. den. 351 *U. S.* 958, 76 *S. Ct.* 844, 100 *L. Ed.* 1480 (1956).

The respondent complains that only the Ethics Committee has the power of discovery. But again he ignores the fact that the initial investigation is only intended to ascertain whether there is need for a plenary proceeding. Once a hearing on the charges is held, the respondent may subpoena witnesses and documents which he believes are appropriate and necessary. Due process does *not* require that the respondent be made aware of, or be present at, each of these preliminary investigatory steps. Even in a criminal case this is not so. On the other hand, the respondent is entitled to have access to all relevant and material data which the investigation has uncovered if formal proceedings are instituted.[2] All the underlying factual information upon which the formal presentment was predicated was made available.

The respondent complains that motions in the cause had to be presented to the Supreme Court and this constituted a denial of due process. But as we have pointed out above, the proceeding is one in this Court. No restraint was imposed on the respondent in this respect and he made several motions, all of which were ruled on by the Court.

The respondent also complains that in all other proceedings involving revocations of licenses, appeals from the initial determinations of the administrative agency are available and that no rational basis exists for different treatment for members of the bar. The short answer is that the Constitution has expressly placed the disciplinary function in the Supreme Court. Attorneys are officers of this Court and have been admitted to practice by this Court. Since the appointing and terminating authority is the highest body in the judicial branch of the government, a rational and reasonable basis for distinguishing the disciplinary hearing from

---

[2] We permitted respondent to examine and copy all documents and materials related to the charges except the investigation report.

administrative proceedings is obvious. *Mildner v. Gulotta, et al.,* 405 *F. Supp.* 182, 193–194 (E. D. N. Y. 1975), aff'd —— *U. S.* ——, 96 *S. Ct.* 1489, 47 *L. Ed.* 2d 751, 44 *U. S. L. W.* 3545 (1976).

The respondent has had a fair and meaningful hearing and his constitutional due process rights have been protected and preserved. His motions are denied.[3]

## II. THE PARMIGIANI AFFAIR

The respondent had unsuccessfully defended Angelo Parmigiani in a jury trial in the Mercer County Court against charges of falsely swearing to answers to interrogatories in a civil action, obtaining money by false pretenses and a conspiracy to defraud. *State v. Angelo's Motor Sales,* 125 *N. J. Super.* 200 (App. Div. 1973), *aff'd sub nom., State v. Parmigiani,* 65 *N. J.* 154 (1974). The trial was concluded in June 1972. A motion for a new trial was argued and denied on August 26, 1972.

This disciplinary proceeding arose out of a subsequent interrogation of the jurors conducted by investigators hired by the defendant Parmigiani.

▆ Respondent was initially charged with a violation of *R.* 1:16–1 which reads as follows:

Except by leave of court granted upon good cause shown, no attorney or party shall himself or through any investigator or other person acting for him interview, examine or question any grand or petit juror with respect to the verdict or deliberations of the jury in any action.

At the first hearing day before the Ethics Committee on January 29, 1974, a committee member raised the question whether the charge should more properly be premised upon DR 7–108(C) which provides:

---

[3]The Court has been reviewing and studying the County Ethics Committee operation and procedures. Discussions have been held with the New Jersey State Bar Association and it is contemplated that some revisions will be made.

Except by leave of court no attorney shall himself or through any investigator or other person acting for him interview, examine or question any grand or petit juror with respect to any matter relating to the case.

The hearings were suspended and the Committee sought the advice of the Administrative Director of the Courts. The Committee was advised to amend the charge. Over respondent's objection that he was being subjected to double jeopardy, the amendment was permitted. The amendment did not modify the factual episode and respondent was afforded a full opportunity to meet the amended charge. Respondent has demonstrated no rational basis to justify dismissal of the disciplinary proceedings because of double jeopardy.

In his brief respondent argues that the amendment constituted a violation of his constitutional due process rights, relying upon *In the Matter of Ruffalo,* 390 *U. S.* 544, 88 *S. Ct.* 1222, 20 *L. Ed.* 2d 117, reh. den. 391 *U. S.* 961, 88 *S. Ct.* 1833, 20 *L. Ed.* 2d 874, mod. on other grounds, 392 *U. S.* 919, 88 *S. Ct.* 2257, 20 *L. Ed.* 2d 1380 (1968). However, that case is inapposite. There the attorney had been charged with soliciting clients with Federal Employers' Liability Act claims through one Orlando. On the third day of trial, a charge was added that the attorney hired Orlando to investigate his own employee. The amendment to the charge was made *after* the defendant and his key witness had testified at length on all the material facts pertaining to this phase of the case. The Supreme Court noted that it was unfair under these circumstances to amend the charges on the basis of the testimony of the accused. In the instant case the respondent had not testified. The defense that the investigator was not respondent's agent was the same under both the Rule and the Disciplinary Rule. Consequently, the only change concerned the subject matter of the investigator's interrogation. Respondent had sufficient opportunity to meet the charge and was not subjected to the "trap" condemned in *Ruffalo. Furthermore,* he has not

indicated that he has been prejudiced in any substantive manner. *Cf. R.* 3 :7–3 (a) which provides that error in the statutory citation in an indictment is not ground for reversal of a conviction if the error "did not prejudicially mislead the defendant;" *State v. Bott,* 53 *N. J.* 391, 402–403 (1969). We note in passing that the complaint must allege "the facts constituting the alleged improper conduct," *R.* 1 :20–4(a), but that the particular Disciplinary Rule need not be specified. *See In re Kamp,* 40 *N. J.* 588, 598–599 (1963).

Mr. Parmigiani had been sentenced on January 5, 1973. As the defendant, the respondent and a close friend of defendant, Mrs. English, were leaving the courthouse, Mr. Parmigiani indicated he wanted the jury interrogated. The request was prompted by a suspicion he harbored that some jurors may have known an assistant prosecutor who had been present at the trial and may not have answered some of the voir dire questions truthfully. When asked for the name of an investigator, the respondent recommended several including a Robert Allen.

Mr. Parmigiani and Mrs. English phoned Mr. Allen and met with him the next day. A form employment contract drafted by Allen was executed by Parmigiani. Respondent apparently did not review or see this agreement. Parmigiani paid Allen for his services.

Mrs. English testified that Allen was to obtain the names and addresses of the jurors and a list of the voir dire questions from respondent. Allen and his assistant, McGantlin, would then interrogate the jurors about their answers to those questions.

What followed is described in the Findings of Fact of the Committee, which after our review of the record, we accept:

Priscilla W. Pols was a juror at the trial before the Mercer County Court in June, 1972. On or about January 14, 1973, Mrs. Pols was visited by two men claiming to be private detectives, one of them named Robert Allen and the other named Michael McGant-

lin. They asked if Mrs. Pols had been on the Parmigiani jury and said they wanted to talk to her about it. They utilized a list of questions, apparently the same list that Mr. Logan utilized on voir dire of the potential jury, and in addition to these questions concerning Mrs. Pols' acquaintance with the defendants, the lawyers involved in the case, officers of the court, and so on, the gentlemen also wanted to know what happened in the jury room while the jury was deliberating. Specifically, Mrs. Pols' testimony on this point reads as follows:

Q. Now, what questions did they ask of you on that occasion which were different from the questions which were asked of you prior to the trial?

A. Well, the questions that were different were questions as to what had happened in the jury room when we were deliberating.

Q. Now, I don't want you to tell us as to what transpired in the jury room, but I would like you to tell us what questions were asked of you, if you recall, on January the 14th pertaining to what transpired in the jury room.

A. Well, they asked whether some jurors had known the defendants or had some business with them, or had prejudgments about the case. They asked me if any of the jurors had been pressured into giving their verdict. They suggested that other jurors had told them something like that was going on.

Q. Now, when they — at any time during the course of their meeting with you, did they advise you as to — as to whether or not they had been employed by any particular person or persons?

A. Yes. I believe after they had asked a few of the questions that they started out with which were the sort of voir dire questions, we suggested or we said: you're working for the defense, we take it. And they said; yes, we are.

Q. Okay. And that was that, to the best of your recollection, was — was there anything else said concerning who they were working for or who had sent them?

A. They said Mr. Logan had.

Q. Did they — had you asked them specifically as to whether Mr. Logan had sent them? Do you recall?

A. I do not remember if it was a statement like; well, Mr. Logan sent me; or not. But we were — as they were going through all these questions, we were obviously talking back and forth, and when we discussed it, we specifically mentioned Mr. Logan's name, and they mentioned Mr. Logan's name. And so, it was perfectly clear to us that Mr. Logan had sent them.

According to her testimony, Mrs. Pols did not reveal to the private detectives anything that occurred in the jury room, except to point out that what the gentlemen suggested happened did not really happen.

After Messrs. Allen and McGantlin left Mrs. Pols' house, she discussed the incident with her father. Mrs. Pols' husband was present when the private investigators had called upon Mrs. Pols and to-

gether, Mrs. Pols, her husband and father discussed the visit and all felt uneasy about it. Coincidentally, Mrs. Pols' father was serving on Petit jury duty at this time and he mentioned it to the Sheriff when he reported for duty the following day. According to Mrs. Pols, the Sheriff told her father that this was not supposed to happen and the matter was referred to the Mercer County Prosecutor's Office. Mrs. Pols was summoned to the office and spoke with then First Assistant Prosecutor, Wilbur H. Mathesius. In addition to Mr. Mathesius, Assistant Prosecutor Richard Altman also met with Mrs. Pols. The prosecutors questioned Mrs. Pols about the incident involving Messrs. Allen and McGantlin and Mrs. Pols gave to the Prosecutors the business card previously given to her by Mr. Allen, identifying the man and his detective agency.

It is obvious that six months intervened between the end of the Parmigiani trial and the visit by the two private detectives upon Mrs. Pols. The matter came to the attention of the Mercer County Prosecutor's Office in January, 1973.

On January 15, 1973, Mrs. Pols and Richard H. Allen, a licensed private detective of the State of New Jersey, were interviewed by Prosecutor Mathesius. [A transcript of the questions and answers has been prepared by a certified shorthand reporter, but the Committee has not read or otherwise considered the testimony contained in this transcript. We have called Mrs. Pols as a witness and she has testified under oath, subject to cross examination by the respondent and further questioning by the Committee. Mr. Allen was subpoened [sic] to testify before this Committee. He appeared at our initial hearing on January 29, 1974. He was not reached that day and has thereafter neglected to appear, notwithstanding the issuance of several additional subpoenas. We have not had the benefit of testimony from Mr. Allen but we have decided to conclude the matter and we make our findings independent of Mr. Allen's testimony regarding the events discussed in this report.]

When then Prosecutor Bruce M. Schragger was advised of the complaint from Mrs. Pols (perhaps more precisely, from Mr. Waring, Mrs. Pols' father), he authorized further investigation into the matter and conferred with Judges Kingfield and Moore. According to Mr. Schragger, Judge Kingfield authorized him to conduct an investigation and directed that the results be turned over to the Court upon its completion. Judge Moore was consulted, because he was the trial judge in the Parmigiani case.

The Mercer County Prosecutor's Office then undertook a preliminary investigation into the conduct of Mr. Logan by interviewing Mrs. Pols and Mr. Allen and according to Mr. Schragger, "Judge Kingfield authorized us to proceed with the investigation, including monitoring any 'phone calls with the consent of the detective."

Mr. McGantlin, Mr. Allen's associate, was enlisted by the Prosecutor's Office to participate in the investigation. Mr. Allen agreed to cooperate with the Prosecutor, even though he had originally been hired as a private detective for the defendant Parmigiani, and

together, Messrs. Allen and McGantlin filled roles akin to "double-agents."

There now arises a conflict in the testimony. Unfortunately, we never obtained testimony from Mr. Allen so we do not know his version of the facts. Mrs. Pols suggests that Mr. Logan hired Messrs. Allen and McGantlin to conduct an investigation into the Parmigiani jury. She asserts that neither Mrs. Parmigiani nor Mrs. Elizabeth English, a friend of Mr. Parmigiani, were mentioned by the detectives when they called upon her in January, and her account of what happened at her home varies from the situation suggested by Mrs. English in her testimony.

No other juror was interrogated and no relationship between the respondent and the juror interrogated was shown except his recommendation of investigators and the following telephone conversation between Mr. Allen and respondent which was recorded on January 18, 1973:

Mr. Allen: He said he had it done. So, we had Mrs. English looking for the bill on that; and we spoke to the other juror, Mrs. Pols, Priscilla Pols, and

Mr. Logan: Yeah, how is she by the way?

Mr. Allen: Well you know, she's the highly educated type and she stated that

Mr. Logan: Priscilla, what's her last name?

Mr. Allen: Pols. P-o-l-s.

Mr. Logan: Oh, Pols, yeah.

Mr. Allen: Right, so she didn't give too much information but we spoke to Mrs. Brown, also, which I had spoken to you about.

Mr. Logan: Yeah.

Mr. Allen: And she stated that during the deliberation one guy held out and . . ., his name was Vacca, V-a-c-c-a, remember?

Mr. Logan: Oh, yeah.

Mr. Allen: And evidently his mind was changed by Reginald . . .

Mr. Logan: Isn't that awful? That guy Reginald is the guy that killed us, wasn't he?

Mr. Allen: Yeah, he did. But, we picked up another lead. Do you want us to follow it through with the others?

Mr. Logan: Yeah.

Mr. Allen: Right.

Mr. Logan: Okay.

Mr. Allen: Okay, Jim. Howabout that DeSanto's case, when is that coming up?

Mr. Logan:  I don't know. That guy has been getting a hold of me, trying to get a hold of me to get it scheduled, but I just haven't had a chance to get back to him.

Mr. Allen:  Okay.

Mr. Logan:  I'll let you know.

Mr. Allen:  Vacca, at least one of the men spoke with Vacca, and he stated that he was going to get in touch with his attorney. He didn't want to say anything without contacting his attorney first. And he was the guy who held out. So, I wonder do you want us to pursue that?

Mr. Logan:  Well you know, it's up to you. As far as I'm concerned I've nothing to do with this deal. This is, Angelo got you guys to make this check. I've got nothing to do with it.

At the Ethics Committee hearing respondent was asked to explain this conversation.

Q. All right. Now, going back to where he said, to where Allen said: "But we picked up another lead. Do you want us to follow it through with the others?" And you answered: "Yeah." How do you interpret your answer in that respect?

A. Well, my whole attitude was that everything that Allen was doing was up to him. I didn't give him any instructions or any directions or anything of the kind. The "Yeah" in that case was just a comment.
The rest of the transcript indicated that I told him it was up to him.

The respondent contends that Allen and McGantlin were not hired by him, did not work under his supervision or direction, and were not to submit any findings to him. We note that a written report was transmitted to his office after the investigators began cooperating with the Prosecutor's office. However, respondent was not aware of the report and never read it. *In toto* we are not satisfied by clear and convincing evidence that respondent engaged the investigators and violated the literal language of the Disciplinary Rule. On the other hand we have no doubt that the spirit of the Rule was violated. We agree with the majority of the Committee that

It is undisputed that Mr. Logan, while representing a criminal defendant, not only was aware of the defendant's desire to carry

out action that clearly was in violation of the disciplinary rule for lawyers but may also have easily become a direct violation of a court rule, and he went beyond merely knowing of Parmigiani's desire to examine a jury but then participated directly in the examination by providing materials to the investigators for their use.

In view of all the foregoing we conclude that the order to show cause as to this matter should be discharged.

## III. THE LIDDELL MATTER

James A. Liddell filed a formal complaint with the Burlington County Ethics Committee concerning his legal representation by respondent in a matrimonial matter. A hearing was held and the Committee made the following factual findings which we find supported by clear and convincing evidence and which we adopt:

The committee finds as fact that Mr. Liddell retained Mr. Logan to represent him in a matrimonial matter in the early part of 1972. The complainant had been represented earlier by another attorney, but sought Mr. Logan's services to secure a reduction in support which Mr. Liddell was ordered to pay. Mr. Liddell was obviously misinformed about an order by Judge Anthony P. Tunney, Jr. that superceded a previous order by Judge W. Thomas McGann, and when the complainant failed to comply with the later order, he was noticed for contempt. When he appeared to answer the contempt charge, however, he wanted to be heard on his application to reduce the support.

Mr. Logan accepted a fee from Mr. Liddell and appeared for him at the contempt hearing. Conditions were set by Judge Tunney whereby the complainant could purge himself of the contempt, and ultimately these conditions were met. The day after the contempt hearing Mr. Logan filed his motion to reduce support, and on March 24, 1972 a hearing on that motion was held before Judge Tunney. Before deciding the motion, however, Judge Tunney directed Mr. Logan to produce his client's 1971 income tax return. Mr. Liddell and his present wife testified that they immediately went to their home, obtained a copy of the return, and went to Mr. Logan's office — all within a matter of hours after the hearing. In his answer to the complaint before this committee, Mr. Logan asserted that he had never received the return, but at the hearing Mr. Logan acknowledged that he must have received it. And rightly so, for the clerk's file shows that Judge Tunney received a letter from Mr. Logan on June 16, 1972 which enclosed the requested return.

Notwithstanding the directive of Judge Tunney to produce the 1971 tax return, a copy of which was quickly supplied to Mr. Logan by his client, the respondent neglected to send the return to the judge for approximately three months. In the interim, Judge Tunney decided the motion adversely to Mr. Liddell and awarded counsel fees of $150 to Harold Bogatz, Esquire, who represented the former Mrs. Liddell at the hearing. Moreover, when Mr. Liddell inquired of Mr. Logan about the status of the case and, particularly, about whether Mr. Logan had sent the return to Judge Tunney, Mr. Logan at first told Mr. Liddell he had not received the return from him on March 24, then Mr. Logan told Mr. Liddell that he had "found" the return in the file and that it was sent to Judge Tunney. The affect [sic] Mr. Liddell's return would have had on Judge Tunney's decision can not now be determined, but it must be presumed that Judge Tunney wanted to review the return, or he would not have withheld decision until acquiring it, and the failure to send the return to the judge when directed might well have affected the outcome of the case, to the detriment of Mr. Liddell.

The respondent's misrepresentation to his client, his failure to ascertain the facts and his overall carelessness not only reflect adversely on himself but create an atmosphere which is generally harmful to the profession.

The conduct evidenced here is below the standard expected of the bar, and respondent is hereby reprimanded.

*For reprimand*—Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD—6.