599 A.2d 1265

IN THE MATTER OF MAGDY F. ANIS, AN ATTORNEY AT LAW.

Argued September 10, 1991—Decided January 10, 1992.

449

450

*Patrick J. Monahan, Jr.* argued the cause on behalf of Committee on Attorney Advertising.

*Michael D. Schottland* argued the cause for respondent (*Schottland, Vernon, Aaron & Costanzo,* attorneys).

PER CURIAM.

The familiar spectacle of lawyers and their agents preying on the victims of disaster has occasioned revulsion and prompted calls for reform. In the aftermath of the tragic release of poison gas at the Union Carbide plant in Bhopal, India, "American lawyers rushed to India in an attempt to retain clients and in their zeal brought shame and discredit to the American Bar." Eric S. Roth, *Confronting Solicitation of Mass Disaster Victims*, 2 *Geo. J. Legal Ethics* 967, 972 (1989) (Roth). The examples of abuse are chilling. Shortly after the crash of a Northwest airliner in Detroit on August 16, 1987, a man posing as a Catholic priest appeared on the scene to console the families of the victims. He " 'hugged crying mothers and talked with grieving fathers of God's rewards in the hereafter. He even sobbed along with dazed families * * *. Then he would pass out the business card of a Florida attorney * * * and repeatedly urge them to call the lawyer.' " Roth, *supra*, 2 *Geo. J. Legal Ethics* at 972 n. 19 (quoting Matt Beer, *'Priest' at Crash Site Recommends Lawyer*, Nat'l L.J., Oct. 5, 1987, at 3). After the crash of Pan Am Flight 103 in Scotland, one victim's widow reported solicitation "by no less than 30 attorneys within 24 hours of the crash." *Ibid.* (citing Andrew Blum, *Lawyers Start Mapping Pan Am Crash Tactics*, Nat'l L.J., Jan. 9, 1989, at 3, 20).

Other examples abound. "How much money would you like to get out of this case?" a letter asked the mother of a child who had recently suffered brain damage in an automobile accident. It was one of three letters she had received from attorneys within two weeks of her son's accident. In the same envelope was a police report with the lawyer's card stapled to it. In the view of an Oregon Bar Association commentator, "[s]uch a letter clearly offends common decency." Richard Sanders, *Lawyer Advertising and Solicitation: the Good, the Bad, the Unethical*, 50 *Or. St. B. Bull.* 5 (June 1990); *see generally* Linda S. Althoff, *Solicitation after an Air Disaster: The Status of Professional Rules and Constitutional Limits,*

54 *J. Air. L. & Com.* 501 (1988) (Althoff) (discussing ethical and constitutional dimensions of solicitation).

The question in this case is whether the commercial speech guarantees of the First Amendment confer on lawyers the right to engage in such conduct—conduct that clearly offends common decency. We think not and therefore disapprove the ruling of our Committee on Attorney Advertising, which held that such a solicitation letter cannot constitute unethical conduct because it is a protected form of commercial speech. We conclude that a public reprimand is the appropriate measure of discipline under the circumstances of this case.

I

This case arises from the tragic disaster on December 21, 1988, involving Pan American Flight 103 over Lockerbie, Scotland. On that homeward-bound holiday flight, American passengers, many of them college students, were the victims of international terrorism. One of the victims was Alexander Lowenstein, a student at Syracuse University and resident of Morristown, New Jersey. His remains were identified on January 3, 1989. The following day, respondent and his brother, Fady F. Anis, sent the following solicitation letter to Peter Lowenstein, Alexander's father:

Dear Mr. Lowenstein:

Initially, we would like to extend our deepest sympathy for the loss of your son, Mr. Alexander Lowenstein. We know that this must be a very traumatic experience for you, and we hope that you, along with your relatives and friends, can overcome this catastrophe which has not only affected your family but has disturbed the world.

As you may already realize, you have a legal cause of action against Pan American, among others, for wrongful death due to possible negligent security maintenance. If you intend to take any legal recourse, we urge you to consider to retain our firm to prosecute your case.

Both my partner [Fady] and myself are experienced practitioners in the personal injury field, and feel that we can obtain a favorable outcome for you against the airline, among other possible defendants.

We would also like to inform you that if you do decide to retain our services, you will *not* be charged for any attorneys fees unless we collect a settlement or verdict award for you.

Before retaining any other attorney, it would be worth your while to contact us, since we will substantially reduce the customary one-third fee that most other attorneys routinely charge.

Please call us to schedule an appointment at your earliest convenience. If you are unable to come to our office, please so advise us and we will have an attorney meet you at a location suitable to your needs.

Very truly yours,

(Mr.) Magdy F. Anis

MFA/seb

P.S. There is no consultation fee.

The hollow sentiments of the letter's opening line could only have deepened the family's suffering. On January 12, 1989, Peter Lowenstein filed a complaint with the Office of Attorney Ethics (OAE). The OAE referred the letter to the Committee on Attorney Advertising (Committee). A formal complaint alleged that respondent and his brother had improperly engaged in a written communication with a prospective client when they knew or should have known that the person's physical, emotional, or mental state was such that the prospective client could not exercise reasonable judgment in employing a lawyer. That conduct violates *RPC* 7.3(b)(1). An amended complaint charged the two attorneys with engaging in false and misleading advertising by sending a letter that was misleading and contained material misrepresentations in violation of *RPC* 7.1(a)(1). Respondent and his brother have raised a due-process challenge to the amended charge, seeking dismissal on the grounds of "unfairness." We have considered their procedural arguments and have concluded that under *In re Logan,* 70 *N.J.* 222, 231, 358 *A.*2d 787 (1976), they have been afforded "sufficient opportunity to meet the charge."

The attorneys also asserted that their conduct was constitutionally protected, citing *Shapero v. Kentucky Bar Ass'n,* 486 *U.S.* 466, 108 *S.Ct.* 1916, 100 *L.Ed.*2d 475 (1988), and referring to an unanswered inquiry that they had sent to the Committee. Consideration of the full record convinced the Committee that clear and convincing evidence demonstrated that the attorneys had engaged in false and misleading advertising in violation of *RPC* 7.1(a)(1). The Committee reasoned that although the

letter stated that respondent and his brother Fady would substantially reduce the customary one-third fee, it did not state the amount of the fee and failed to indicate any range of fees for the legal services to be rendered. Indeed, it suggested that other attorneys would charge a one-third fee on a recovery, despite the rule that in the event of a recovery in excess of $250,000 no attorney may charge that amount absent a court order. *See R.* 1:21–7. The Committee also found that the letter misrepresented the professional backgrounds of both brothers for the purpose of retaining employment in potentially sophisticated litigation, a violation of *RPC* 7.1(a)(1). Respondent had been admitted to the bar in 1987 and his brother, Fady, in 1984. Neither brother was a certified civil or criminal trial attorney, and neither of them had ever tried a case to a judge or jury or handled a personal injury matter involving the negligence of an airline. The Committee concluded that

> [t]here is absolutely no basis in the record to suggest to the public that they were experienced practitioners in the personal-injury field in general and, implicitly, international aircraft litigation in particular. Their perception of themselves, if such was the case, was clearly erroneous. Their representation as to their experience constituted a false and misleading communication.

The Committee determined that without the misleading statement, the targeted direct-mail solicitation, notwithstanding the shocking circumstances in which it arose, was constitutionally protected. It reasoned that *Shapero, supra,* 486 *U.S.* 466, 108 *S.Ct.* 1916, 100 *L.Ed.*2d 475, which had disapproved blanket bans on all targeted mail solicitation, required that result.

The Committee recommended that both attorneys be publicly reprimanded. The Disciplinary Review Board (DRB), which pursuant to our Rules of Procedure reviews such disciplinary recommendations, determined that clear and convincing evidence fully supported the Committee's conclusion that respondent, Magdy F. Anis, had engaged in unethical conduct. It did not agree, however, that the facts merited discipline in the case of his brother, Fady F. Anis. Fady had been out of the State when Magdy had mailed the letter and had not participated in its mailing. The DRB also dismissed a related charge against

both Fady and Magdy of violating *RPC* 5.1(a) (failure to make reasonable efforts to ensure that all members of a law firm conform to the Rules of Professional Conduct). Because the solicitation letter was dated two weeks after the Lockerbie crash, the DRB concluded that it was debatable whether the attorneys would have known that the families would be unable to exercise reasonable judgment with respect to retaining counsel. Accordingly, it found no violation of *RPC* 7.3(b)(1), albeit not on the constitutional basis of protected speech that the Committee had found. The DRB recommended a private reprimand for Magdy Anis. The Court issued an order to show cause why he should not be otherwise disciplined.

## II

The time has long since passed when we can view the practice of law as a matter of public trust in which a barrister's fee was but a gratuity for the performance of a public service. Barristers wore their purses at their backs to allow the payment of fees "without any face-to-face exchange or acknowledgment of the commercial transactions." Althoff, *supra*, 54 *J. Air L. & Com.* at 519 n. 117. The time has not yet come, however, when we must view the practice of law as akin to the sale of aluminum siding. It is not that we think any the less of those engaged in such a calling; we expect the truth of them too. *See N.J.A.C.* 13:45A–16.1 to –16.2. It is simply that we expect much more from attorneys. We have adopted a model of professionalism commensurate with the duties of our calling:

[T]hrough all the [years] * * * the legal profession has played a role all its own. The bar has not enjoyed prerogatives; it has been entrusted with anxious responsibilities. One does not have to inhale the self-adulatory bombast of after-dinner speeches to affirm that all the interests of man that are comprised under the constitutional guarantees given to "life, liberty and property" are in the professional keeping of lawyers.

[*In re Vincenti*, 92 *N.J.* 591, 603, 458 *A.*2d 1268 (1983) (quoting *Schware v. Board of Examiners*, 353 *U.S.* 232, 247, 77 *S.Ct.* 752, 760, 1 *L.Ed.*2d 796, 806 (1957) (Frankfurter, J., concurring)).]

From a profession charged with such responsibilities, there must always be exacted "a high sense of honor." *Ibid.* That standard surely translates into conduct that does not fall below the meager level of common decency that should attend the usual affairs of humankind.

Respondent's conduct falls within a window left open in *Shapero, supra,* 486 *U.S.* 466, 108 *S.Ct.* 1916, 100 *L.Ed.*2d 475. In a long series of cases the Supreme Court has etched out a pattern for decision in such matters. We reviewed most of the early cases in *In re Felmeister & Isaacs,* 104 *N.J.* 515, 537, 518 *A.*2d 188 (1986), our seminal decision on attorney advertising.

■ The Supreme Court has devised a standardized legal test for commercial-speech cases. Such speech is entitled to constitutional protection only if it concerns lawful activities and is not misleading. Government may regulate even protected speech with laws that directly advance a substantial governmental interest and are appropriately tailored to that purpose. *Peel v. Attorney Disciplinary Comm.,* 496 *U.S.* 91, ——, 110 *S.Ct.* 2281, 2287, 110 *L.Ed.*2d 83, 94 (1990). A blanket ban on a targeted direct-mail solicitation of parties facing a foreclosure suit could be regarded as a violation of commercial speech rights, *Shapero, supra,* 486 *U.S.* 466, 108 *S.Ct.* 1916, 100 *L.Ed.*2d 475, but such a solicitation presents none of the factors that concern us here.

The non-intrusive nature of the communication in *Shapero* is what commended the solicitation to commercial speech protection. *See Shapero, supra,* 486 *U.S.* at 475–78, 108 *S.Ct.* at 1922–24, 100 *L.Ed.*2d at 485–87. In contrast, the form of solicitation at issue here is so universally condemned that its intrusiveness can hardly be disputed. An editorial cartoon in a Miami newspaper portrayed lawyers after the Delta 911 air crash disaster as " 'vultures, members of the law firm of Pickem, Pickem, Scavage & Bone ... Don't Call Us—We'll Call You!' " Howard R. Messing, *The Latest Word on Solicitation, Fla. Bar J.,* May 1986, at 17 n. 3 (quoting The Miami Herald,

Aug. 16, 1985, at 20A). Those are not the reactions of competitors, nor of establishment lawyers, nor even of airline-industry officials. Those are the reactions of the very public that lawyers serve.

█ We have always emphasized that one of the central goals of attorney discipline is to maintain public confidence in the bar and in the professionalism of its members. We have not enacted a blanket ban on targeted direct-mail solicitation. We believe, however, that the proscription of *RPC* 7.3(b)(1) against such direct solicitation of clients who are vulnerable and probably not able to make a reasoned judgment on their behalf surely embraces the hours and days after such a tragic disaster occurs or, as here, after the loss becomes known. Members of the plaintiffs' bar candidly admit that people are particularly vulnerable at such times. They criticize the controversial "Alpert letter" that survivors often receive from airlines on the basis that "the letter takes advantage of families when. they are emotionally weak and vulnerable and attempts to get them to settle for less money than they might recover after filing a law suit." Roth, *supra,* 2 *Geo. J. Legal Ethics* at 976–77. (The "Alpert letter" is an inverse form of solicitation used by an airline's insurer that is designed to dissuade survivors and the families of victims of mass disaster from filing lawsuits or hiring an attorney on a contingent-fee basis. *Id.* at 975–76.)

█ The DRB reasoned that respondent could not be held to have violated *RPC* 7.3(b)(1) because no proof existed that the respondent actually knew that the Lowenstein family would be unable to make a reasoned judgment about retaining counsel. We disagree. The standard that we attach to this Rule of Professional Conduct is an objective one. We believe that an ordinarily prudent attorney would recognize that within the hours and days following a tragic disaster, families would be particularly weak and vulnerable. Indeed, experience confirms such objective expectations. A mother, faced with attorney solicitation shortly after her daughter's death in a car crash,

reacted: "give me some time—I am still grieving." Allessandra Stanley, *Bronx Crash, Then Contest of Lawyers*, N.Y. Times, June 17, 1991, at B1. That some recipients might not be offended by such a letter does not rebut the generality of experience that the intrusive nature of such solicitation compounds the suffering of victims or their families. Similarly, an objective standard relieves lawyers of the burden of ascertaining whether prospective clients might be unduly sensitive. Whatever doubts may exist about the outer limits embraced by *RPC* 7.3(b)(1), any reasonable lawyer would conclude that an obsequious letter of solicitation delivered the day after a death notice would reach people when they "could not exercise reasonable judgment in employing a lawyer * * *." *RPC* 7.3(b)(1). Although respondent proffered that he delayed mailing his letter so that "it wouldn't be tasteless," he admitted that he did not know at the time that he mailed the letter whether Alexander's body had yet been identified.

■ Respondent's contention that the limitations placed on attorney advertising by *RPC* 7.3(b)(1) are unconstitutionally overbroad is without merit. The United States Supreme Court has stated that the overbreadth doctrine does not normally apply to commercial speech. *See Board of Trustees v. Fox*, 492 *U.S.* 469, 481, 109 *S.Ct.* 3028, 3035, 106 *L.Ed.*2d 388, 404 (1989).

■ We have no doubt, then, that the commercial speech guarantees of the First Amendment do not protect attorney conduct that is universally regarded as deplorable and beneath common decency because of its intrusion upon the special vulnerability and private grief of victims or their families. Even in the limited context of the bland, targeted direct-mail solicitation of mortgagors in a foreclosure proceeding, the dissenting members in *Shapero* emphasized the substantial public interest concomitant with the special role of attorneys. 486 *U.S.* at 488–91, 108 *S.Ct.* at 1929–31, 100 *L.Ed.*2d at 494–96 (O'Connor, J., dissenting). In her dissenting opinion, Justice O'Connor pointed out the reason that we regulate lawyers at

all, indeed, to a greater extent than most other professions are regulated:

> Operating a legal system that is both reasonably efficient and tolerably fair cannot be accomplished * * * under modern conditions, without a trained and specialized body of [attorneys]. This training is one element of what we mean when we refer to the law as a "learned profession." * * * One distinguishing feature of any profession, unlike other occupations that may be equally respectable, is that membership entails an ethical obligation to temper one's selfish pursuit of economic success by adhering to standards of conduct that could not be enforced either by legal fiat or through the discipline of the market * * *.
>
> Imbuing the legal profession with the necessary [legal and] ethical standards is a task that involves a constant struggle with the relentless natural force of economic self-interest. * * * Restrictions on advertising and solicitation by lawyers * * * act as a concrete day-to-day reminder to the practicing attorney of why it is improper for any member of this profession to regard it as a trade or occupation like any other. [*Id.* at 488–90, 108 *S.Ct.* at 1929–30, 100 *L.Ed.*2d at 494–96.]

We have recognized the attorneys' right to distribute truthful, non-deceptive advertising of their services. See *RPC* 7.1. Indeed, lawyer advertising may provide alternative avenues of relief to members of the public who are unaware of the legal options available to them. Even in cases of mass disaster, general public notices in affected regions might serve that end without the offensive intrusiveness of a targeted solicitation. *See* Althoff, *supra*, 54 *J. Air L. & Com.* at 520–21 n. 119.

Nothing in the Constitution, however, requires us to countenance solicitation that intrudes upon victims or their families in the initial throes of their grief. In imposing discipline for such conduct, we wish to make it clear that we do not seek to convert into constitutional doctrine some sort of an effete etiquette for lawyers nor even a disguised version of the previously-disapproved standard of dignity for attorney advertising. *See In re Felmeister & Isaacs, supra,* 104 *N.J.* at 547, 518 *A.*2d 188. What we are talking about here, as is our concurring member, is conduct that is patently offensive to the common sensibilities of the community because it intrudes upon the private grief of victims or their families, serves only to compound their sorrow, and solicits representation of them at a moment of their extreme vulnerability.

■ On the basis of our independent review of the record, see *R.* 1:20–5(a), we find clear and convincing evidence that respondent solicited legal representation at a time when he knew or should have known that the prospective clients could not exercise reasonable judgment in employing an attorney, in violation of *RPC* 7.3(b)(1). We realize that there may be other cases in which it will be more difficult to draw the line of ethical propriety. Would a truthful solicitation letter sent fifteen or thirty days after a tragic loss reach people when they are no longer emotionally weak or vulnerable? We cannot say with certainty, since our assumptions in such cases are largely untested. It may be that there are degrees of loss or suffering. Common sense tells us that the mildly-injured survivors of an overturned-bus incident might be less vulnerable than were the Lockerbie families. Hence, we attempt no permanent bright-line rule in this opinion. We hereby refer the issue to our Committee on Attorney Advertising to conduct the type of informational hearing that might best inform us how we might draw a clearer line of vulnerability. In such a hearing process, the Committee might invite comments from the public or public organizations concerned with the delivery of legal services.

■ We are mindful that whatever lines we draw may economically disadvantage New Jersey lawyers in relation to unscrupulous lawyers from unregulated jurisdictions. We cannot, however, establish our attorney discipline at the lowest common denominator of ethics. Even those attorneys from other jurisdictions must abide by our Rules of Professional Conduct when they perform services in New Jersey. *See R.* 1:20–1(a). Pending the suggested hearing process, and in order to give New Jersey attorneys reasonable interim guidance, absent some case-specific indications to the lawyer that the family could not exercise reasonable judgment in the matter, we shall not impose discipline for truthful letters of solicitation sent more than two weeks after such a disaster occurs and loss becomes known.

## III

■ Based on our independent review of the record, we also find clear and convincing evidence that the respondent engaged in misleading advertising in the two respects cited. His letter incorrectly implied that a normal attorney's fee would be one-third, despite the "graduated fee" provisions of *Rule* 1:21-7. His argument that the Warsaw Convention invariably limits damages to $75,000 only illustrates his inexperience in this type of potentially complex litigation. When damage is caused by an airline's "willful misconduct," it may be subject to unlimited compensatory liability. *See In re Air Disaster at Lockerbie, Scotland,* 928 *F.*2d 1267, 1285–86 (2d Cir.1991); *In re Korean Air Lines Disaster of September 1, 1983,* 932 *F.*2d 1475, 1488–89 (D.C.Cir.1991) ("It is settled that willful misconduct negates the due care exclusion from liability contained in Article 20 and the monetary limitations contained in Article 22."). In addition, others might have been made parties defendant. His letter also falsely implied that he was experienced in litigating aircraft accidents. Nothing could be further from the truth. Even were we to credit fully his proffer of proof about the general negligence practice of his firm, there is simply no correlation between such an office practice and the degree of expertise in aircraft accident trials that his letter implied.

■ We recognize respondent's youth and inexperience, but we cannot agree that the private reprimand recommended by the DRB will sufficiently measure the discipline to be imposed. The entire record of the proceedings below is before us in this review. *Rule* 1:20–5(a) requires the Court to review all presentments to the DRB that recommend public discipline. The Committee on Attorney Advertising had recommended that the DRB impose a public reprimand. We conclude that the written solicitation of understandably vulnerable clients and the false and misleading nature of the letter warrant a public reprimand.

Respondent is to reimburse the Ethics Financial Committee for appropriate administrative costs.

HANDLER, Justice, concurring.

Shortly after a large commercial airplane crashed at Lockerbie, Scotland, killing everyone on board, respondent Magdy F. Anis, and his brother, Fady F. Anis, sent a letter to Peter Lowenstein, whose son perished in the tragedy. The letter, which Mr. Lowenstein received on the day following the confirmation of his son's death, invited Mr. Lowenstein to consider employing the Anis law firm to secure legal redress for his son's death. Respondent's letter also contained false and misleading statements relating to the lawyers' qualifications for such professional services.

I concur in the Court's determination that respondent engaged in misleading advertising that warrants professional discipline. I also share the Court's dismay at respondent's insensitivity in mailing such a letter to the parent of an accident victim. Although such conduct richly deserves the strongest kind of disapproval and criticism imaginable, my remaining concern is that the Court's opinion may be misconstrued as an invitation to turn indecency or callousness into a critical factor in disciplinary matters involving attorney advertising.

This concern relates to the Court's interpretation of the focus of the ethical prohibition contained in Rules of Professional Conduct 7.3(b)(1) (hereinafter *"RPC"*), which provides in pertinent part:

(b) A lawyer shall not contact, or send a written communication to a prospective client for the purpose of obtaining professional employment if:

   \*      \*      \*      \*      \*      \*      \*      \*

(1) the lawyer knows or reasonably should know that the physical, emotional or mental state of the person is such that the person could not exercise reasonable judgment in employing a lawyer....

The Comment to *RPC* 7.3 states that the purpose of this rule is to prevent social harms such as harassment and overreaching, and that the circumstances under which the contact is initiated should be considered in determining whether such a violation occurs. Its focus is exclusively on the state of mind of the attorney sending the communication and indirectly on the

presumed emotional or mental condition of the person receiving the communication. Other ethics rules govern the acceptability of other aspects of communications involving proposals of "professional employment," including false or misleading statements. *See RPC* 7.1 and 7.2.

The Court, in characterizing respondent's letter, states that "the commercial speech guarantees of the First Amendment do not protect attorney conduct that is universally regarded as deplorable and beneath common decency because of its intrusion upon the special vulnerability and private grief of victims of their families." *Ante* at 458, 599 *A.2d* 1265. That interpretation properly indicates that *RPC* 7.3(b)(1) is concerned with important privacy interests of persons who may be considered potential clients. The Court's emphasis on individual privacy interests, however, is also coupled with the notion of "common decency." The Court reverses the determination of the Committee on Advertising, namely, that "a solicitation letter [that offends common decency] cannot constitute unethical conduct because it is a protected form of commercial speech." *Ante* at 452, 599 *A.2d* 1265. According to the Court, the central issue in this case is whether the First Amendment prohibits an attorney's "commercial speech" that "offends common decency." *Ibid.*

I do not read the Court's holding to suggest that "common decency" constitutes a determinative factor in assessing attorney conduct implicating commercial speech. Rather, I interpret the Court's opinion to be that *RPC* 7.3(b)(1) focuses on the need to protect a class of persons, potential clients, from certain harmful forms of professional behavior. The prohibitions contained in the rule are designed to prevent attorneys from transforming personal tragedies into business opportunities generated at the public's expense. It may be that the conduct involved in sending mailings to members of the public who are distraught and vulnerable because of tragedies in their lives is "beneath common decency." That conduct should be prohibited

because it is hurtful and invasive, not because it is indecent or contemptible.

We should not suggest that the gravamen of the misconduct under the rule is its lack of decency. A rule that could be interpreted to bar indecent or offensive advertising lacks the clarity of purpose necessary to preserve the protections that are afforded to commercial speech. *Bates v. State Bar of Arizona*, 433 *U.S.* 350, 97 *S.Ct.* 2691, 53 *L.Ed.*2d 810 (1977). The basic standards for determining whether an attorney's exercise of commercial speech violates the ethics rules governing advertising have been expressed by the United States Supreme Court in several cases: *Peel v. Attorney Disciplinary Comm.*, 496 *U.S.* 91, 110 *S.Ct.* 2281, 110 *L.Ed.*2d 83 (1990); *Zauderer v. Office of Disciplinary Counsel*, 471 *U.S.* 626, 105 *S.Ct.* 2265, 85 *L.Ed.*2d 652 (1985); *Central Hudson Gas & Elec. v. Public Service Comm.*, 447 *U.S.* 557, 100 *S.Ct.* 2343, 65 *L.Ed.*2d 341 (1980). The commercial speech of attorneys may be restricted only to advance a substantial governmental interest and only through means that directly advance that interest. *Peel*, 496 *U.S.* at ——, 110 *S.Ct.* at 2287, 110 *L.Ed.*2d at 94.

Although the State has a substantial interest in preventing attorney advertising that is false and misleading, it has no cognizable interest in preventing attorneys from engaging in advertising that only offends societal mores. Thus, in *Zauderer*, the Supreme Court expressed doubt that the state's desire that their attorneys maintain "dignity" is "an interest substantial enough to justify the abridgement of their First Amendment rights." 471 *U.S.* at 648, 105 *S.Ct.* at 2280, 85 *L.Ed.*2d at 670. In *In re Felmeister & Isaacs*, 104 *N.J.* 515, 518 *A.*2d 188 (1986), we faced a challenge to *RPC* 7.2(a), which required all attorney advertisements "to be presented in a dignified manner." There we rejected the "dignity" standard, noting both the Supreme Court's reluctance to apply the standard in *Zauderer* and the general difficulties involved with the application of such a standard. *Id.* at 547, 518 *A.*2d 188. The Court concluded that the same interests could be protected by requir-

ing all attorney advertisements to be "predominantly informational."

Setting aside my disagreement with the implementation of that requirement, I agreed with the Court in *Felmeister* that the dignity, tastefulness or style of an advertisement should not be considered relevant as a regulatory standard. *Felmeister, supra,* at 564–65, 518 *A*.2d 188 (Handler, J., concurring in part and dissenting in part). The only concerns that are relevant to restrictions on attorney advertising focused on the false or misleading nature of the communications or other substantial state interest:

> A court should not have to fret about whether an advertisement appeals more to the heart than the mind. Instead, it should concentrate on whether an attorney's advertisement may effectively serve the public by alerting some consumers to a previously unsuspected need for legal help ... [I]t is unlikely that attorneys will be able to engage with impunity in ... offensive advertising ... [a]s observed in [*Grievance Comm. v.*] *Trantolo, supra,* [192 Conn. 15] 470 A.2d [228] at 234, "[I]f some members of the audience find * * * [the advertisements] distasteful, such consumers might very well react by shunning the service offered, thereby implying an informed sanction more effective than any formal regulation." [*Id.* at 565, 518 *A*.2d 188.]

The United States Supreme Court in *Shapero v. Kentucky Bar Association,* 486 *U.S.* 466, 108 *S.Ct.* 1916, 100 *L.Ed.*2d 475 (1988), dealt with attorney commercial advertising in the form of direct mail solicitations. The Court fully recognized the heightened vulnerability of potential clients in certain settings. It opined that attorney mailings, even though targeted to persons with special needs, are far less overreaching than in-person solicitation because the latter entails the kind of immediate response and badgering not applicable to the former. *Id.* at 475, 108 *S.Ct.* at 1922, 100 *L.Ed.*2d at 486.

The Court in *Shapero,* however, did not immunize attorney advertising in the form of direct mailings from the reasonable restrictions that are allowed under the First Amendment. Although the Court expressed concern about well-intended, but overbroad, restrictions on free speech, it concluded that a blanket prohibition could not be placed on mailings to clients known to have particular legal needs. In that case, a member

of the Kentucky Bar had applied to the State Attorneys Advertising Commission for approval of a letter that he wanted to send to "potential clients" against whom a foreclosure suit had been filed. The letter stated that "[f]ederal law may allow you to ... ORDE[R] your creditor to STOP," and that "you may call my office for FREE information," and that "[i]t may surprise you what I may be able to do for you." The Court's primary inquiry in *Shapero* was whether the mailings, which specifically targeted those known to need legal services and who were therefore overly susceptible to coercive pressures by lawyers, would allow lawyers to exploit that susceptibility. 486 *U.S.* at 474, 108 *S.Ct.* at 1922, 100 *L.Ed.*2d at 484–85. Thus, although the Court acknowledged that direct-mail solicitations were far less intrusive or offensive than in-person solicitations, they themselves presented opportunities to exploit client susceptibilities. However, the existence of such opportunities does not justify a total ban. *Ibid.* The instruction of *Shapero* is that the First Amendment limits a state's ability to dictate the form and content by which an attorney solicits legal business, and that regulatory interference with attorney advertising may not be permitted absent a showing that a substantial state interest would be served by such regulation.

The Court recognizes that there is an important distinction between *Shapero* and the instant case that lies in the intrusiveness of the communication. It states that the lawyer's conduct in the present case was so universally condemned that "its intrusiveness can hardly be disputed." *Ante* at 456–457, 599 *A.*2d 1269–1270. The content of the letter, considered in the context in which it was sent, renders it invasive and hurtful. Its offensive quality inheres in the harmfulness of the attorney's conduct, exploiting the vulnerability and exacerbating the suffering of a potential client. The indecency and incivility of sending such a letter to someone who has, as in this case, just experienced a tragedy, surely offends our sensibilities. However, "[d]ecency," as such, is not the central consideration, and, indeed, may serve as a confusing and ambiguous criterion for

evaluating ethical conduct with respect to commercial speech; it is because such conduct hurts people and destroys their privacy that it should be restrained.

The Court's explanation of the standards that must govern our advertising restrictions should therefore focus on the harmful and invasive aspects of such commercial speech, and not on any articulation of restrictions in terms of "decency." The Court's concerns are best served by analyzing attorney advertising in terms of protecting overwrought and vulnerable persons from attorneys who attempt to solicit employment, as well as the State's obligation to protect the right to privacy of citizens facing a tragedy in their lives. These concerns, I believe, undergird government's substantial interest in assuring the welfare of its citizens, an interest that can well be accommodated by the First Amendment.

Therefore, I agree with the Court that we should refer this matter to our Committee on Attorney Advertising to consider guidelines explaining the conditions governing written advertisements directed by attorneys to vulnerable members of the public. Such a rule should identify and define the circumstances under which professional solicitations will unduly infringe on personal privacy or will increase personal suffering.

*For reprimand* —Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

## ORDER

It is ORDERED that MAGDY F. ANIS of JERSEY CITY and HAZLET, who was admitted to the bar of this State in 1987, be publicly reprimanded, and it is further

ORDERED that the entire record of this matter be made a permanent part of respondent's file as an attorney at law of this State; and it is further

ORDERED that respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs incurred in the prosecution of this matter.