715 A.2d 216

IN THE MATTER OF RAVICH, KOSTER, TOBIN,
OLECKNA, REITMAN & GREENSTEIN, A
NEW JERSEY LAW FIRM.

IN THE MATTER OF KENNETH S. OLECKNA,
AN ATTORNEY AT LAW.

IN THE MATTER OF CHARLES E. MEADEN,
AN ATTORNEY AT LAW.

IN THE MATTER OF RAYMOND EISDORFER,
AN ATTORNEY AT LAW.

Argued March 17, 1998—Decided July 28, 1998.

*Lee A. Gronikowski,* Deputy Ethics Counsel, on behalf of the Office of Attorney Ethics.

*David B. Rubin* argued the cause for respondents Ravich, Koster, Tobin, Oleckna, Reitman & Greenstein and Kenneth S. Oleckna.

*Bernard K. Freamon* argued the cause for respondent Charles E. Meaden.

*Michael P. Ambrosio* argued the cause for respondent Raymond Eisdorfer.

PER CURIAM.

This is an attorney-disciplinary case in which respondents were charged with violations of the *Rules of Professional Conduct* governing the solicitation of clients, in this case, the victims of a disaster. At the request of the Court, the matter was initiated by an investigation undertaken by the Committee on Attorney Advertising. The Committee's determination and disciplinary recommendations were reviewed by the Disciplinary Review Board. The Board's decision is before the Court based on the petition of the Office of Attorney Ethics.

I

Shortly before midnight on March 23, 1994, a gas line explosion rocked the Durham Woods apartment complex in Edison, completely destroying eight of the sixty-three apartment buildings. The blast displaced all 1500 residents from their homes. Luckily, no one was directly killed by the explosion, and relatively few people were physically injured. Unfortunately, however, many people lost everything they owned, including their cars.

The American Red Cross immediately established an emergency shelter in the Edison High School. The cafeteria was turned into a reception and food area, while the gymnasium was converted to a sleeping and living area. Witnesses described the atmosphere in the shelter as chaotic with residents appearing scared, disoriented, and distraught. Victims also found emergency shelter in several different local hotels.

After the press reported in several articles that attorneys were "preying" upon the victims, we ordered the Committee on Attorney Advertising (CAA) to investigate. Subsequently, four attorneys, Kenneth S. Oleckna, Charles E. Meaden, Raymond Eisdorfer, and Samuel Convery, and one law firm, Ravich, Koster, Tobin, Oleckna, Reitman & Greenstein, P.C., a/k/a TEAMLAW (TEAM-

LAW), were charged with violating *Rules of Professional Conduct* (*RPC* ) 7.3(b)(1) and (4). The CAA recommended that Meaden be suspended for three months, that Oleckna, TEAMLAW, and Eisdorfer be reprimanded, and that the charges against Convery be dismissed pursuant to *Rule* 1:19A–4. The Disciplinary Review Board (DRB) considered the matter *de novo* and determined that Meaden should be reprimanded rather than suspended and that all charges against the other respondents should be dismissed.

The Office of Attorney Ethics (OAE) agreed with the recommendation of the CAA in each of the matters, including the dismissal of the charges against Convey. Accordingly, the OAE petitioned this Court to review the DRB's decisions concerning the other respondents. Respondents all filed letter briefs in opposition. On February 3, 1998, we granted the OAE's petitions for review and also dismissed the Convery matter.

## II

The issue before us is whether the three attorneys and one law firm violated the provisions set forth in the *Rules of Professional Conduct* by soliciting clients after the mass disaster at Durham Woods. At the time of the events at issue here, *RPC* 7.3(b) stated in pertinent part:

A lawyer shall not contact, or send a written communication to, a prospective client for the purpose of obtaining professional employment if:

(1) the lawyer knows or reasonably should know that the physical, emotional or mental state of the person is such that the person could not exercise reasonable judgment in employing a lawyer; or

. . . .

(4) the communication involves direct contact with a prospective client concerning a specific event when such contact has pecuniary gain as a significant motive except that a lawyer may send a letter by mail to a prospective client in such circumstances provided that the letter:

(i) bears the word "ADVERTISEMENT" . . . and

(ii) contains the following notice . . . "Before making your choice of attorney, you should give this matter careful thought . . . ."; and

(iii) contains an additional notice [that if the letter is misleading, the recipient may report the attorney to the CAA].

In *In re Anis*, 126 *N.J.* 448, 599 *A.*2d 1265, *cert. denied sub nom. Anis v. New Jersey Committee on Attorney Advertising,*

504 *U.S.* 956, 112 *S.Ct.* 2303, 119 *L. Ed.*2d 225 (1992), the Court considered the ethics implications of attorney solicitation of clients who were the victims or the surviving relatives of the victims of a disaster. The Court analyzed *RPC* 7.3(b) and its application to the actions of an attorney following the December 21, 1988, downing of Pan American Flight 103 in Lockerbie, Scotland. 126 *N.J.* at 452, 599 *A.*2d 1265. In determining that the attorney should be publicly reprimanded for sending a letter of solicitation to the grieving family of a victim shortly after the disaster, we noted that the State may regulate commercial speech with laws "that directly advance a substantial governmental interest and are appropriately tailored to that purpose." *Id.* at 456, 599 *A.*2d 1265. We ruled that the level of intrusion involved with the solicitation of grieving persons is such that proscribing that conduct implicates a substantial governmental interest and that *RPC* 7.3(b) directly advances this interest. 126 *N.J.* at 458–59, 599 *A.*2d 1265. The Court found that the attorney's conduct fell within that governmental interest, reasoning that it was "patently offensive to the common sensibilities of the community because it intrudes upon the private grief of victims or their families, serves only to compound their sorrow, and solicits representation of them at a moment of their extreme vulnerability." *Id.* at 459, 599 *A.*2d 1265.

Most important, the Court disagreed with the DRB's conclusion that *RPC* 7.3(b)(1) requires proof that the attorney knew that the person he solicited was unable to make a reasoned judgment about obtaining counsel. 126 *N.J.* at 457, 599 *A.*2d 1265. We found rather that *RPC* 7.3(b)(1) contained an objective standard for determining whether a prospective client would be able to make a reasoned judgment. 126 *N.J.* at 457, 599 *A.*2d 1265.

The Court acknowledged the difficulty in drawing a bright line cutoff when solicitation may begin. *Id.* at 460, 599 *A.*2d 1265. We referred the issue to the CAA to conduct a hearing to devise a "clearer line of vulnerability." *Ibid.* [1]

---

[1] On April 28, 1997, after the facts of this case took place, the Court adopted an amendment to *RPC* 7.3(b) which states in pertinent part:

Three years after *Anis*, the United States Supreme Court addressed the issue of attorney solicitation in *Florida Bar v. Went For It, Inc.*, 515 *U.S.* 618, 115 *S.Ct.* 2371, 132 *L. Ed.*2d 541 (1995). The disciplinary rules at issue in *Florida Bar* created a thirty-day blackout period after an accident during which attorneys could not, directly or indirectly, solicit accident victims or their relatives. *Id.* at 620–21, 115 *S.Ct.* at 2374, 132 *L. Ed.*2d at 547. In upholding the ban on targeted solicitation, the Supreme Court noted that the ban serves the salutary purposes of "protecting the personal privacy and tranquility of citizens from crass commercial intrusions by attorneys upon their personal grief in times of trauma" and "forestall[ing] the outrage and irritation with the state-licensed legal profession that the practice of direct solicitation only days after accidents has engendered." *Id.* at 630–31, 115 *S.Ct.* at 2379, 132 *L. Ed.*2d at 553–54.

The evils of in-person solicitation for pecuniary gain after an accident extend beyond intrusion upon private grief and tarnishment of the legal profession. *See Anis, supra*, 126 *N.J.* at 459, 599 *A.*2d 1265; *Florida Bar, supra*, 515 *U.S.* at 630–31, 115 *S.Ct.* at 2379, 132 *L. Ed.*2d at 553–54. Such solicitation presents an opportunity for "fraud, undue influence, intimidation, overreaching, and other forms of vexatious conduct." *Ohralik v. Ohio State Bar Ass'n*, 436 *U.S.* 447, 462, 98 *S.Ct.* 1912, 1921, 56 *L. Ed.*2d 444, 457 (1978). "[I]n-person solicitation may exert pressure and often demands an immediate response, without providing an op-

---

A lawyer shall not contact ... a prospective client for the purpose of obtaining professional employment if:

(4) the communication involves unsolicited direct contact with a prospective client within thirty days after a specific mass-disaster event, when such contact concerns potential compensation arising from the event; or

(5) the communication involves unsolicited direct contact with a prospective client concerning a specific event not covered by section (4) of this Rule when such contact has pecuniary gain as a significant motive except that a lawyer may send a letter by mail to a prospective client [provided the letter complies with this Rule's following specifications].

That revision is not at issue here because it was not in effect when respondents acted in response to the explosion.

portunity for comparison or reflection." *Id.* at 457, 98 *S.Ct.* at 1919, 56 *L. Ed.*2d at 454. The "aim and effect of in-person solicitation may be to provide a one-sided presentation and to encourage speedy and perhaps uninformed decisionmaking; there is no opportunity for intervention or counter-education by agencies of the Bar, supervisory authorities, or persons close to the solicited individual." *Ibid.* "In-person solicitation is as likely as not to discourage persons needing counsel from engaging in a critical comparison of the 'availability, nature, and prices of legal services.'" *Id.* at 457–58, 98 *S.Ct.* at 1919, 56 *L. Ed.*2d at 454. That such overreaching in-person solicitation in fact occurred in this case is evidenced by the fact that many of the clients initially procured by the respondents decided, when given sufficient time to reflect, that their best interest lay in representation elsewhere. Further, a

lawyer who engages in personal solicitation of clients may be inclined to subordinate the best interests of the client to his own pecuniary interests. Even if unintentionally, the lawyer's ability to evaluate the legal merit of his client's claims may falter when the conclusion will affect the lawyer's income. A valid claim might be settled too quickly, or a claim with little merit pursued beyond the point of reason. These lapses of judgment can occur in any legal representation, but [the court] cannot say that the pecuniary motivation of the lawyer who solicits a particular representation does not create special problems of conflict of interest.

[*Id.* at 461 n. 19, 98 *S.Ct.* at 1921 n. 19, 56 *L. Ed.*2d at 457 n. 19]

### III

Respondent Kenneth Oleckna, a partner in respondent TEAM-LAW, learned on March 24, 1994, that there had been an explosion at Durham Woods. Oleckna and TEAMLAW decided to set up a mobile office for potential clients at the site. The next morning, Oleckna and TEAMLAW rented a "Winnebago-type recreational vehicle" (RV) and parked it 100 feet from the shelter that had been established at Edison High. By 9 p.m., no one had called, so Oleckna left.

The next morning, Oleckna returned to the RV after TEAM-LAW received two calls from clients unable to come to the firm's office. Oleckna brought with him copies of the advertisement the

firm was to run in the weekend paper and taped several copies of it to the windows of the RV. The advertisements thus identified the RV with TEAMLAW. Oleckna also had a case of toiletry kits supplied by TEAMLAW that he handed out to clients who were interviewed by him in the RV after having been referred there by the firm's principal office. Before leaving at the end of the day, Oleckna entered the high school and left the remaining kits on an empty table for victims to use; the kits did not bear any markings identifying them with TEAMLAW.

On Sunday morning, March 27, Oleckna received a phone call from the Edison Police Department telling him that they would tow the RV unless it was moved promptly. Oleckna then moved the RV to the Durham Woods apartment complex and parked it on the grass next to a trailer from which insurance adjusters were taking releases and paying residents. Later that day, Oleckna was forced to remove the RV from the grass, so he drove it home. On Monday, Oleckna drove the RV back to the apartment complex to handle the substantial number of telephone inquiries the firm had received after its advertisement had run in the Sunday papers. As clients continued to call the principal office, paralegals were dispatched from the RV to the clients' apartments to gather information and take care of necessary paperwork. The RV was returned to the lessor the next day.

The CAA found that Oleckna had violated *RPC* 7.3(b)(1). It felt that the RV, parked in close proximity to the victims and bearing multiple advertisements, evidenced an intent to target victims and initiate contact with them. The CAA also determined that because the decision to use the RV had been made by the firm, TEAMLAW should also be held responsible. The CAA recommended that both Oleckna and TEAMLAW receive a reprimand.

The DRB, however, determined that the complaints should be dismissed. Distinguishing *Anis, supra*, the DRB noted that in this case the mere presence of ads on a van could not serve to make the victims feel importuned, overwhelmed, or pressured into undertaking an unwanted professional relationship. Further,

there was no indication that the defendants knew or should have known that the victims were so distraught that they could not exercise reasonable judgment in employing a lawyer. Three members of the DRB dissented and would have reprimanded Oleckna and TEAMLAW on the basis that the ads on the van were a form of solicitation; one of these DRB members felt that the mere presence of an on-site temporary office was improper and should be banned in the future.

■ Based on our independent review of the record and the foregoing facts, which we find by clear and convincing evidence, we conclude that both Oleckna and TEAMLAW stepped beyond the bounds of *RPC* 7.3(b)(1).

■ Oleckna and TEAMLAW attempt to distinguish this case from *Anis, supra,* 126 *N.J.* 448, 599 *A.*2d 1265. First they note that while in *Anis* the prohibited conduct centered upon solicitation of parents whose child had died, the victims in the instant case suffered, for the most part, no physical injury and were faced "merely" with dispossession and loss of all their earthly belongings. Unlike the grieving parents in *Anis,* they maintain, these victims were capable of making a clear and reasoned judgment concerning their legal representation. We reject the contention, however, that the disciplinary rule at issue requires us to "distinguish between victims in terms of the severity of their injuries." *See Florida Bar, supra,* 515 *U.S.* at 632, 115 *S.Ct.* at 2380, 132 *L. Ed.*2d at 555. Where, as here, there has been by anyone's terms a "disaster," we decline to "draw[ ] difficult lines on the basis that some injuries are 'severe' and some situations appropriate (and others, presumably, inappropriate) for grief, anger, or emotion." *See id.* at 633, 115 *S.Ct.* at 2380, 132 *L. Ed.*2d at 555. Although we are not dealing with a mass disaster involving numerous deaths as we were in *Anis,* the Durham Woods explosion certainly was a disaster affecting many people in deep and unfortunate ways. It cannot be gainsaid that the victims of the explosion, fresh from losing their apartments, cars, and personal belongings, were in a state of mind not conducive to making reasoned judgment about

such a weighty matter as legal representation. Thus, the brief temporal ban we crafted in *Anis,* is "applicable to all postaccident or disaster solicitations." *See ibid.* Finally, we note that there are no "obvious less-burdensome alternatives" to this "short temporal ban" on direct, targeted solicitation of disaster victims, *see ibid.,* and there are "ample alternative channels for receipt of information about the availability of legal representation during the [brief blackout] period following accidents," *see id.* at 634, 115 *S.Ct.* at 2381, 132 *L. Ed.*2d at 555–56.

Respondents further contend that there was no evidence that the disaster victims in this case were in fact so emotionally traumatized as to be unable to make a reasoned decision; many such persons, they note, were eager to obtain the advice of counsel. As we stated in *Anis, supra,* however, no such proof of harm is needed; the standard that we attach to RPC 7.3(b)(1) is "an objective one." 126 *N.J.* at 457, 599 *A.*2d 1265. The "overtures of an uninvited lawyer may distress the solicited individual simply because of their obtrusiveness and the invasion of the individual's privacy, even when no other harm materializes." *Ohralik, supra,* 436 *U.S.* at 465–66, 98 *S.Ct.* at 1923, 56 *L. Ed.*2d at 459–60. The "efficacy of the State's effort to prevent such harm to prospective clients would be substantially diminished if, having proved a solicitation, ... the State were required in addition to prove actual injury." *Id.* at 466, 98 *S.Ct.* at 1924, 56 *L. Ed.*2d at 460. "Often there is no witness other than the lawyer and the lay person whom he has solicited, rendering it difficult or impossible to obtain reliable proof of what actually took place." *Ibid.* Thus, "the absence of explicit proof or findings of harm or injury is immaterial." *Id.* at 468, 98 *S.Ct.* at 1925, 56 *L. Ed.*2d at 461.

Thus, under our objective standard, Oleckna and TEAMLAW should have known that the victims of the explosion could not have made a reasonable judgment about legal representation. Their actions here, placing a recreational vehicle within 100 feet of the entrance to the emergency shelter and posting advertisements on that vehicle, constituted prohibited solicitation that reduces the

practice of law to the high-pressured pushing of legal services as a commodity onto susceptible and vulnerable consumers, ill-equipped to protect their own interests. These actions, in such close temporal and spatial proximity to a devastating mass disaster, constitute just the sort of "vexatious conduct" that New Jersey has a "legitimate and important interest" in preventing. *See id.* at 462, 98 *S.Ct.* at 1921, 56 *L. Ed.*2d at 457. The question is not, as the DRB put it, whether the ads made the victims who passed by feel "importuned, overwhelmed ... or pressured"; rather, the question is whether the attorneys should have known that the victims in these circumstances were not able to "exercise reasonable judgment in employing a lawyer," *RPC* 7.3(b)(1). We conclude that under the objective standard in *Anis*, Oleckna and TEAMLAW should be charged with that level of awareness.

█ It is argued, somewhat disingenuously, by respondents in this case that they performed the valuable legal service of providing the accident victims "with information about [their] legal rights and remedies." *See Ohralik, supra,* 436 *U.S.* at 458, 98 *S.Ct.* at 1919, 56 *L. Ed.*2d at 454. Indeed, it is true that the injured or their families "often f[a]ll prey" to "persuasive claims adjusters eager to gain a quick and cheap settlement." *Id.* at 459 n. 16, 98 *S.Ct.* at 1920 n. 16, 56 *L. Ed.*2d at 455 n. 16. However, nothing prohibits an attorney from "communicating information" to these victims "about their legal rights and the prospects of obtaining a monetary recovery, or from recommending that they obtain counsel." *Id.* at 458, 98 *S.Ct.* at 1919, 56 *L. Ed.*2d at 455. All that is prohibited is "using the information as bait with which to obtain an agreement to represent them for a fee." *Ibid.*

█ Respondents Oleckna and TEAMLAW also contend they were engaging in protected First Amendment activity when they placed ads in the windows of an RV parked outside the disaster relief center. While it is true that attorneys "may not be disciplined for soliciting legal business through printed advertising containing truthful and nondeceptive information," even when that advertising contains information regarding a specific legal prob-

lem, *Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 647, 105 *S.Ct.* 2265, 2279, 85 *L. Ed.*2d 652, 670 (1985), it does not follow necessarily, however, that respondents here engaged in protected constitutional activity. First, a State may place "reasonable restrictions on the time, place; and manner of advertising." *Bates v. Arizona Bar,* 433 *U.S.* 350, 384, 97 *S.Ct.* 2691, 2709, 53 *L. Ed.*2d 810, 836 (1977); *see also In re Primus,* 436 *U.S.* 412, 438, 98 *S.Ct.* 1893, 1908, 56 *L. Ed.*2d 417, 439 (1978) (noting that "State is free to fashion reasonable restrictions with respect to the time, place, and manner of solicitation by members of its Bar"). Second, the placement of the van with the ads constituted a course of conduct that has both expressive and non-expressive elements. "[W]hen 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *United States v. O'Brien,* 391 *U.S.* 367, 376, 88 *S.Ct.* 1673, 1678–79, 20 *L. Ed.*2d 672, 679–80 (1968); *see also Texas v. Johnson,* 491 *U.S.* 397, 406, 109 *S.Ct.* 2533, 2540, 105 *L. Ed.*2d 342, 354–55 (1989) (noting that the "government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word").

Accordingly, we conclude based on clear and convincing evidence that Oleckna and TEAMLAW violated the provisions of *RPC* 7.3(b)(1). The DRB reached the same conclusion but decided that discipline should nonetheless be withheld because application of the rules to this case would not be fair given the lack of prior decisional law on the matter. We disagree. *Anis, supra,* clearly established that an attorney violates *RPC* 7.3(b)(1) whenever that attorney contacts a client or prospective client when "an ordinarily prudent attorney would recognize that within the hours and days following a tragic disaster, families would be particularly weak and vulnerable." 126 *N.J.* at 457, 599 *A.*2d 1265. Oleckna and TEAMLAW failed to comply with that standard, one announced more than two years prior to the Durham Woods explo-

sion. We thus reject the disposition recommended by the DRB and instead determine that reprimands be imposed.[2]

## IV

Respondent Raymond Eisdorfer first learned of the explosion on Friday, March 25, when Raphael Londono, a former client and close personal friend who resided in the Durham Woods apartment complex, invited him to visit the emergency shelter at Edison High and speak to a group of fifteen people there regarding their legal remedies. Eisdorfer met with the group on Friday afternoon. They met in Edison High School's gymnasium which had been turned into the sleeping and living area for the shelter residents. Some members of the group claimed that even before the meeting they knew that Eisdorfer would represent them. Others claimed that they attended the meeting to make a decision about legal representation.

Eisdorfer spoke to the group for about one and a half hours. The main concern of the group was to have legal counsel before speaking with insurance representatives because the insurance company had representatives at the shelter making payments and obtaining receipts for emergency expenses. Eisdorfer assured the group that they were not giving up their legal rights by accepting emergency payments for living expenses from the insurer. He also had the group execute retainer agreements.

At some point during the meeting, a Red Cross official approached Eisdorfer and asked him to leave because lawyers were not permitted in the shelter. Londono objected and told the official that he had invited Eisdorfer to the shelter to speak to the group. The official responded that the meeting could not take place in the shelter and offered to transport the group to another site for privacy. Eisdorfer agreed to leave, but actually remained until a police officer approached him thirty minutes later and

---

[2] The reprimand of the law firm of TEAMLAW is ordered pursuant to *In re Jacoby & Meyers*, 147 *N.J.* 374, 687 A.2d 1007 (1997).

asked him to leave. By the end of the meeting, Eisdorfer had signed retainer agreements with twenty-six residents. On Saturday, he obtained retainer agreements from another twenty residents. By June 17, 1994, he represented a total of 222 victims, almost none of whom had been his clients before the explosion. According to Eisdorfer, the clients came from unsolicited referrals made by other members of the initial group with whom he initially met.

The CAA found Eisdorfer to have violated *RPC* 7.3(b)(1) and would have recommended a three-month suspension but, given the lack of prior decisional law, determined instead to recommend that Eisdorfer be reprimanded.

The DRB voted to dismiss the charges, concluding that Eisdorfer had been invited by the group to whom he spoke, that he had done nothing to identify himself as an attorney to other shelter residents, and that the noise level at the shelter was sufficiently high so that other residents could not overhear. The DRB did not consider Eisdorfer's refusal to leave to be an aggravating factor, given that his client and the rest of the group wanted him to stay. Eisdorfer asserted, and the majority of the DRB agreed, that to discipline him for failing to leave the high school where he was speaking would violate his and the group's assembly rights.

 Again, based on clear and convincing evidence, we conclude that Eisdorfer violated *RPC* 7.3(b)(1) with his direct personal solicitation of clients following the explosion. Eisdorfer certainly journeyed to the emergency shelter with the intent to obtain professional employment; thus, the provisions of *RPC* 7.3(b) apply to his conduct regardless of whether he was asked there or went on his own. Although, as the DRB pointed out, Eisdorfer did not identify himself to others as an attorney and no one outside the group overheard his conversation with the group, his actions constituted contact with prospective clients when he should have known that they could not exercise reasonable judgment in employing a lawyer. Much of our determination is based on the location and timing of Eisdorfer's meeting with his prospective

clients: to conduct a legal seminar in the sleeping area of an emergency shelter a day after a massive explosion displacing hundreds is conduct that "provide[s] a one-sided presentation and [ ] encourage[s] speedy and perhaps uninformed decisionmaking [without] opportunity for intervention or counter-education by agencies of the Bar, supervisory authorities, or persons close to the solicited individual." *See Ohralik, supra,* 436 *U.S.* at 457, 98 *S.Ct.* at 1919, 56 *L. Ed.*2d at 454.

 Eisdorfer asserted that a conclusion that his actions violated *RPC* 7.3(b)(1) would be a deprivation of the group's associational rights. The DRB agreed with Eisdorfer on this point. Although it is true that the Supreme Court has held that collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment, *see Primus, supra,* 436 *U.S.* at 426, 98 *S.Ct.* at 1901, 56 *L. Ed.*2d at 430; *NAACP v. Button,* 371 *U.S.* 415, 428–29, 83 *S.Ct.* 328, 335, 9 *L. Ed.*2d 405, 415 (1963), the ruling in each of those cases was premised on the fact that "no monetary stakes [we]re involved, and so there [wa]s no danger that the attorney w[ould] desert or subvert the paramount interests of his client to enrich himself," *NAACP, supra,* 371 *U.S.* at 443, 83 *S.Ct.* at 343, 9 *L. Ed.*2d at 424; *accord Primus, supra,* 436 *U.S.* at 430, 98 *S.Ct.* at 1903, 56 *L. Ed.*2d at 433 (noting that there was no evidence that the ACLU, of which the defendant was a member, was "motivated by considerations of pecuniary gain rather than by its widely recognized goal of vindicating civil liberties"). Indeed, "[r]esort to the courts to seek vindication of constitutional rights is a different matter from the oppressive, malicious, or avaricious use of the legal process for purely private gain." *NAACP, supra,* 371 *U.S.* at 443, 83 *S.Ct.* at 343, 9 *L. Ed.*2d at 424. The Supreme Court specifically excepted from its holding the "situation where the income of the lawyer who solicits the prospective litigant[s] or who engages in the actual representation of the solicited client[s] rises or falls with the outcome of the particular litigation." *Primus, supra,* 436 *U.S.* at 436 n. 30, 98 *S.Ct.* at 1907 n. 30, 56 *L. Ed.*2d at 437 n. 30. Far

from being a form of highly protected "political expression" or "association," an area where the State must regulate with "great[ ] precision," Eisdorfer's speech "simply propose[d] a commercial transaction." *See id.* at 437–38, 98 *S.Ct.* at 1908, 56 *L. Ed.*2d at 438.

We note further that Eisdorfer's actions here border on the unethical practice of "running." In *In re Frankel*, 20 *N.J.* 588, 120 *A.*2d 603 (1956), we disciplined an attorney for entering into a monetary agreement with a photographer who would visit accident scenes and solicit negligence cases for the attorney. We characterized the conduct as "reprehensible and vicious" and a "serious transgression of the ethical principle[s]." *Id.* at 598, 120 *A.*2d 603. Misconduct based on "running" remains a public and professional concern. *See, e.g.,* Assembly Bill No. 1829 (reflecting view that the hiring of a runner to solicit professional services on behalf of an attorney should be subject to criminal sanctions); *In re Pajerowski*, DRB No. 97–003 (finding an attorney in violation of several sections of the *RPC* for employing an "office manager" to visit accident victims in homes and hospitals for the purpose of having them sign a retainer for the attorney) (review pending under *Rule* 1:20–16(a)). Although in Eisdorfer's case, Londono did not receive any remuneration for connecting the group of victims with Eisdorfer, the close interaction between Londono and Eisdorfer gives rise to the same concerns that underlie our prohibition of the practice of running.

Because we conclude that Eisdorfer's conduct violated the *RPC* and that our prior determination in *Anis* clearly prohibited his actions, *see supra* at 370–71, 715 *A.*2d at 222, we reject the disposition recommended by the DRB and instead determine that Eisdorfer be reprimanded for his conduct.

V

After hearing about the explosion on the radio, Charles Meaden, a solo practitioner, drove to Edison the day after the explosion

seeking clients. When he was stopped by the Edison police and told that he could proceed no further by car, he began to walk into Edison. While at a nearby gas station, he met Ariv Kahn and informed him that he was a lawyer. Kahn then revealed that his girlfriend had been a victim of the explosion, that she was staying at the Red Roof Inn (Inn) temporarily, and that she might be interested in hiring an attorney. Meaden accompanied Kahn to the hotel.

After Meaden presented her with his business card and a retainer agreement, Kahn's girlfriend made it clear that she did not want to hire Meaden. After that rejection, Meaden stayed in the hotel lounge watching television reports of the explosion.

When it became apparent he was not going to be able to leave the motel for a while, Meaden went downstairs to the main lobby of the hotel to make some phone calls. While sitting in the lobby, a man by the name of Torres sat down next to Meaden. Torres was visibly upset and talked to Meaden about his injured wife and the effect the explosion had on him. Meaden gave Torres his business card and told him that he might follow up by sending him a letter.

Meaden spent a total of three or four hours at the Inn. In total, he handed out business cards to four or five people and compiled a list of the names of sixteen prospective clients. The next day, Meaden drafted a "follow-up" letter to be sent to the persons on the list; the letters were mailed the sixth day after the explosion.

The CAA found Meaden to have violated *RPC* 7.3(b)(1) and (4) by initiating contact with the distraught Torres, for approaching Kahn's girlfriend, and for having sent targeted, direct-mail solicitation letters that did not comply with the specifications of *RPC* 7.3(b)(4). The CAA recommended that Meaden be suspended.

The DRB found that since *RPC* 7.3(b)(1) and decisional law offered insufficient guidance concerning the limits of solicitation, there was no clear and convincing evidence that Meaden's contact with Kahn's girlfriend constituted a violation of the *RPC.* The

DRB determined, however, that there was sufficient evidence to conclude that Meaden's contact with Torres violated *RPC* 7.3(b)(1) and his direct mailing violated *RPC* 7.3(b)(4). The DRB, therefore, recommended that Meaden be reprimanded. Two dissenting members of the DRB felt that Meaden's conduct was not egregious enough to warrant any discipline.

We agree with the DRB's conclusion that Meaden violated both provisions of the *RPC*. Unlike the DRB, however, we hold that Meaden's contact with Kahn's girlfriend also violated *RPC* 7.3(b)(1). When Meaden went to the Red Roof Inn, he knew that the Inn was temporarily housing many of the victims of the explosion. He also went to the Inn specifically for the purpose of pecuniary gain in the form of obtaining professional employment. Knowing that the Inn contained victims still grieving over their losses, Meaden nonetheless contacted Kahn's girlfriend. Two days after the explosion, while living in temporary emergency housing, she was certainly not able to exercise the reasonable judgment necessary for hiring an attorney. That she had the wits about her to refuse Meaden's solicitation does not change our determination that Meaden violated the explicit proscription contained in *RPC* 7.3(b)(1) and explained in *Anis*.

Likewise, Meaden violated *RPC* 7.3(b)(1) with his contact with Torres. As the DRB acknowledged, Meaden gave Torres his business card and told him he would send a follow up letter even though Meaden himself acknowledged that Torres was clearly distressed. Meaden thus possessed the knowledge that Torres was in a mental state such that he could not exercise reasonable judgment in employing a lawyer. With Meaden having actual knowledge of Torres's mental state, we need not even apply the objective standard from *Anis* to conclude that Meaden violated *RPC* 7.3(b)(1). Likewise, Meaden acknowledged that he sent a follow-up letter to Torres that did not comply with the requirements of *RPC* 7.3(b)(4); thus, we agree with the DRB's finding that Meaden violated that provision.

■ Because of Meaden's acknowledged violations of the clear provisions of *RPC* 7.3(b)(1) and 7.3(b)(4), discipline is warranted. We conclude that the appropriate sanction is to reprimand Meaden.

## VI

Based on the reasoning contained in this opinion, we order the imposition of a disciplinary sanction of a reprimand on each of the respondents. So Ordered; and, it is further Ordered that respondents shall reimburse the Disciplinary Oversight Committee for appropriate administrative costs.

O'HERN, J., concurring in part, dissenting in part.

I agree with the Court that in mass disaster cases the setting up of mobile law offices in close proximity to victims immediately following a disaster is a form of targeted solicitation that violates *Rule of Professional Conduct (RPC)* 7.3(b)(1). I also agree that to conduct a legal seminar in the sleeping area of an emergency shelter a day after a massive explosion constitutes direct contact with prospective victims of a mass disaster in violation of *RPC* 7.3(b)(1). Because the Court had not previously made these propositions clear, I do not believe that a public reprimand for the attorneys involved in that conduct is the appropriate discipline in the circumstances of this case.

## I

Looking at the matter in hindsight, the Court holds that *In re Anis,* 126 *N.J.* 448, 599 *A.*2d 1265, *cert. denied sub nom. Anis v. New Jersey Committee on Attorney Advertising,* 504 *U.S.* 956, 112 *S.Ct.* 2303, 119 *L. Ed.*2d 225 (1992), clearly established that the conduct engaged in by Kenneth S. Oleckna and TEAMLAW violated the provisions of *RPC* 7.3(b)(1). One is reminded of Lewis Carroll's familiar aphorism from *Through the Looking Glass* that "a word ... means just what I choose it to mean—neither more nor less," when the Court says that the principles of

law applied to these attorneys were clearly established before the conduct. If it was so clearly established, the Court should please explain how it can be that one of our most respected ethical bodies, the Disciplinary Review Board (DRB), the very body charged with imposition of discipline on attorneys, believed that application of the rules to this case would not be fair given the lack of prior decisional law on the matter. If the respected members of the DRB could not perceive that the law was clearly settled, it strikes me as unfair for the Court to conclude that the law was so clearly settled that the lawyers should be disciplined.

To begin, *Anis* did not deal with the conduct with which we deal here. *Anis* dealt with targeted, direct-mail solicitation—a letter that directly invaded the privacy of the home of the grieving victims of the Lockerbie disaster of 1988. On that homeward-bound holiday flight, American passengers, many of whom were college students, were the victims of international terrorism. At the time of the *Anis* decision, the law was unsettled. We believed that the United States Supreme Court would uphold a proscription of such an intrusion upon the privacy and dignity of individuals. Ultimately, the United States Supreme Court did uphold restraints on targeted, direct-mail solicitation of accident victims. *Florida Bar v. Went For It, Inc.*, 515 *U.S.* 618, 115 *S.Ct.* 2371, 132 *L. Ed.*2d 541 (1995). I might remind the majority that the question is so close that the issue was resolved only by a five to four decision of the Supreme Court. Our own Committee on Attorney Advertising initially refused to implement a rule banning direct solicitation of mass disaster victims. The current rule, which was drafted by our Court, did not take effect until May 5, 1997, some five years after we decided *Anis*.

In his concurring opinion in *Anis*, Justice Handler carefully outlined the narrow circumstances in which a court could limit the First Amendment rights of attorneys to communicate with prospective clients. He emphasized that "the standards that must govern our advertising restrictions should ... focus on the harmful and invasive aspects of such commercial speech, and not on any

articulation of restrictions in terms of 'decency.'" *Anis, supra,* 126 *N.J.* at 467, 599 *A.*2d 1265 (Handler, J., concurring). He therefore recommended that we refer the matter to "our Committee on Attorney Advertising to consider guidelines explaining the conditions governing written advertisements directed by attorneys to vulnerable members of the public. Such a rule *should identify and define* the circumstances under which professional solicitations will unduly infringe on personal privacy or will increase personal suffering." *Ibid.* (emphasis added). That definition never occurred.

At the time of the Edison pipeline blast, the Court had not yet adopted the amendment to *RPC* 7.3(b) that specifically banned unsolicited, direct contact with a prospective client within thirty days after a mass disaster. All that was in place was the generalized *Anis* proscription. As noted, our own Committee on Attorney Advertising had for many years resisted adopting a specific blackout rule pursuant to our suggestion in *Anis.* It was not until July 1, 1997, after the facts of this case took place and after the decision in *Florida Bar,* that the Court finally adopted a thirty-day blackout rule.

It is therefore disingenuous for the Court to say that the issues were clearly settled when the Edison pipeline fire occurred.

## II

Although Raymond Eisdorfer's conduct is of a different dimension, I believe that a reprimand is not the appropriate discipline in his case. Prior to this case, the law was not clear whether the prior version of *RPC* 7.3(b)(1) prohibited discussion with prospective clients at a disaster site when the prior attorney was invited onto the site by a prospective client.

We have regularly held that clarifications of the law of professional responsibility should be applied prospectively. *See In re Hinds,* 90 *N.J.* 604, 449 *A.*2d 483 (1982) (concluding that notions of elementary fairness required prospective application of our interpretation of DR 7–107(d), dealing with criticism of judges because

it was first time we had addressed question); *see also In re Rachmiel*, 90 *N.J.* 646, 660, 449 *A.*2d 505 (1982) (finding appropriate prospective application of first-time announcement of test concerning restriction on attorney associated with prosecution or defense from commenting on guilt or innocence of a criminal defendant or on evidence or merits of case because we were "engaged ... not in the enforcement of criminal laws but in the shaping of disciplinary rules, the purpose of which is to protect the public and to edify and improve the legal profession, rather than to punish").

## III

The conclusion that the attorneys Oleckna and TEAMLAW and Eisdorfer should not be disciplined because this is our first clarification of *Anis* and *RPC* 7.3(b)(1) is supported by long-standing notions of fairness. It is simply not right and fair to discipline these attorneys. The Court's decision will undoubtedly be supported by many members of the bar. In fact, some of the initial complaints concerning the attorneys' conduct came from members of the bar. But our responsibility is not to satisfy the bar. Rather it is to ensure that all lawyers are clearly informed in advance of the rules that apply when there is a collision between the First Amendment and principles of professional responsibility. The whole idea behind the RPCs and the Disciplinary Rules before them was to replace the vague, aspirational, "fraternal admonitions" contained in the Canons of Professional Ethics with a clear set of standards. Note, *Uniform Federal Rules of Attorney Conduct: A Flawed Proposal*, 111 *Harv. L.Rev.* 2063, 2064–65 (1998). Attorneys who push the First Amendment envelope should not be the scapegoats for institutional shortcomings. The confusion that has surrounded the issues in this field is exemplified by the history of the earlier recommendations of the Committee on Attorney Advertising and the recommendations in this very case by the Disciplinary Review Board.

Although our pronouncement in *Anis* clearly delineated the standard to be applied to targeted direct-mail solicitation in mass-disaster cases, the many questions raised by the conduct of these attorneys were left unclear. If the DRB did not believe the RPCs were sufficiently clear to impose discipline, we should clear up the confusion. We should not pretend that the subject was perfectly clear before today's decision.

STEIN, Justice, joins this opinion.

*For reprimand*–Chief Justice PORITZ, and Justices HANDLER, POLLOCK, GARIBALDI and COLEMAN–5.

*Concur in part; dissent in part*–Justices O'HERN and STEIN–2.

## ORDER

It is ORDERED that the law firm of **RAVICH, KOSTER, TOBIN, OLECKNA, REITMAN & GREENSTEIN** of **RAHWAY**, is hereby reprimanded for violating *RPC* 7.3(b)(1); and it is further

ORDERED that the entire record of this matter be made a permanent part of respondent's file as a law firm practicing law in this State; and it is further

ORDERED that respondent reimburse the Disciplinary Oversight Committee for appropriate administrative costs incurred in the prosecution of this matter.

### IN THE MATTER OF KENNETH S. OLECKNA, AN ATTORNEY AT LAW.

### ORDER

It is ORDERED that **KENNETH S. OLECKNA** of **RAHWAY**, who was admitted to the bar of this State in 1972, is hereby reprimanded for violating *RPC* 7.3(b)(1); and it is further

ORDERED that the entire record of this matter be made a permanent part of respondent's file as an attorney at law of this State; and it is further

ORDERED that respondent reimburse the Disciplinary Oversight Committee for appropriate administrative costs incurred in the prosecution of this matter.

## IN THE MATTER OF CHARLES E. MEADEN, AN ATTORNEY AT LAW.

### ORDER

It is ORDERED that **CHARLES E. MEADEN** of **ENGLEWOOD**, who was admitted to the bar of this State in 1982, is hereby reprimanded for violating *RPC* 7.3(b)(1) and 7.3(b)(4); and it is further

ORDERED that the entire record of this matter be made a permanent part of respondent's file as an attorney at law of this State; and it is further

ORDERED that respondent reimburse the Disciplinary Oversight Committee for appropriate administrative costs incurred in the prosecution of this matter.

## IN THE MATTER OF RAYMOND EISDORFER, AN ATTORNEY AT LAW.

### ORDER

It is ORDERED that **RAYMOND EISDORFER** of **ELIZABETH**, who was admitted to the bar of this State in 1988, is hereby reprimanded for violating *RPC* 7.3(b)(1); and it is further

ORDERED that the entire record of this matter be made a permanent part of respondent's file as an attorney at law of this State; and it is further

ORDERED that respondent reimburse the Disciplinary Oversight Committee for appropriate administrative costs incurred in the prosecution of this matter.